IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 23, 2010

## STATE OF TENNESSEE v. MICHAEL W. POE

**Appeal from the Circuit Court for Rhea County**
**No. 16721      J. Curtis Smith, Judge**

**No. E2010-00220-CCA-R3-CD - Filed February 23, 2011**

Following a jury trial, the Defendant, Michael W. Poe, was convicted of first degree felony murder and aggravated child abuse, a Class A felony.  See Tenn. Code Ann. § 39-13-202, -15-402(b).  The trial court sentenced the Defendant to consecutive terms of life in prison for his first degree felony murder conviction and twenty-five years as a violent offender for his aggravated child abuse conviction.  In this direct appeal, the Defendant contends that: (1) the trial court erred when it denied his motion for judgment of acquittal; (2) the trial court erred when it failed to declare a mistrial after one juror made a comment to another juror about the trial; (3) the trial court erred in failing to ask the other jurors whether they heard the comment at issue; (4) the trial court erred when it failed to remove or disable the televisions and radios from the jurors' motel rooms; (5) the trial court erred when it applied two inapplicable enhancement factors and failed to consider one mitigating factor; (6) the trial court erred when it imposed consecutive sentences; (7) the trial court did not award the proper amount of jail credit; and (8) the trial court erred when it failed to dismiss the indictment.  After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Larry G. Roddy, Dayton, Tennessee, for the appellant, Michael W. Poe.

Robert E. Cooper, Jr., Attorney General and Reporter, Matthew Bryant Haskell, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James Pope, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

This appeal arises from the death of Matthew Poe, a twenty-day-old baby, on August 18, 2006. In its October 2006 session, a Rhea County grand jury issued an indictment alleging that the Defendant committed one count of first degree murder, one count of first degree felony murder, and one count of aggravated child abuse. The Defendant's trial was conducted in Rhea County, with a jury from Franklin County, from July 20-23, 2009.

Officer Justin Jackson testified that he worked as a police office for the City of Dayton in August 2006. He said that, at 11:36 a.m. on August 18, 2006, he heard a transmission on his radio that a baby was in distress at the Defendant's residence. Officer Jackson recalled that, when he arrived at the scene at approximately 11:40 a.m., Tammy Perkins,[1] the Defendant's wife, was waiting at the top of the stairway outside the apartment. He said that, when he went inside the apartment, he observed the Defendant kneeling over a small infant who was lying on the living room floor. Officer Jackson described the Defendant's demeanor as "calm" and said that he never saw the Defendant cry or lose his composure. However, he noted that Ms. Perkins "was pretty hysterical." He testified that he did not see the Defendant performing CPR on the victim when he arrived, but that the Defendant told him that he had been performing CPR. Officer Jackson said that he and the Defendant then performed CPR on the victim, with Officer Jackson doing the compressions and the Defendant breathing into the victim's mouth.

Officer Jackson testified that he noticed bruising on the baby's neck, hairline, and back. He also said that he noticed several bloody baby wipes on the coffee table. He stated that the paramedics arrived a few minutes after he did and immediately took the baby to the hospital. He elaborated, "As soon as they c[a]me in the door I think they realized the severity of the situation and they just reached down and got the baby and left with it." Officer Jackson also recalled that the Defendant never asked him which hospital the paramedics were taking his son to, but that Ms. Perkins asked him "[a] minute or two after the ambulance was gone."

Ms. Perkins testified that she suffers from seizure disorder, cannot read, write, or drive a car, and receives a disability check for her condition. She also said that she has scoliosis and cannot lift a lot of weight.

---

[1] Throughout the transcript, the Defendant's wife is called "Mrs. Poe"; however, when she testified at the Defendant's trial, she said her last name was "Perkins." Thus, in this opinion, we will refer to her as Ms. Perkins.

Ms. Perkins said that she and the Defendant married in 2004, after dating for only one week. Subsequently, when she became pregnant and informed the Defendant, she recalled that he told her that he wanted a DNA test and accused her of cheating on him with the preacher that married them. She said that the victim was born six-weeks premature, on July 29, 2006, via an emergency C-section. She recalled that the victim stayed in the hospital for two weeks after he was born and that, during that time, she and the Defendant stayed at the Ronald McDonald House across the street from the hospital because she did not want to leave her son. She said that she and the Defendant attended classes at the hospital about caring for their baby. Ms. Perkins testified that the victim was released from the hospital on August 12, 2006, and that she and the Defendant stayed with the Defendant's mother for several days before they brought the victim to their apartment.

Ms. Perkins said that they took the victim to the doctor for a check-up on August 14, 2006, and that the victim was healthy. She testified that she and the Defendant were trying to fix up their apartment before they brought the victim home. One day in particular, she said that they left the victim at the Defendant's mother's house when they went to the apartment. She stated that the Defendant went to sleep at the apartment and that she was unable to wake him up to ask him to drive her back to his mother's house in Sale Creek. Ms. Perkins explained, "I wanted to go take my son some diapers in Sale Creek, and I was missing my son." Thus, she said she walked from Dayton to Sale Creek, minus the distance that a police officer drove her from Wal-Mart to the Sale Creek city limit.

On the night of August 17, 2006, Ms. Perkins, the Defendant, and the victim arrived at their apartment when it was dark outside. Ms. Perkins said she showed the victim to Ms. Boles, her neighbor, and that Ms. Boles came up to their apartment for a bit, but left around 9:30 p.m. Ms. Perkins said that the Defendant gave the victim a bath that night.

She said that she went to bed around 10:00 or 10:30 p.m., after taking some medications—Percocet for the pain from her C-section and Depakote for her epilepsy. She said that night was the first time she took the medications together and that they made her sleepy. Ms. Perkins recalled that she slept in the bedroom. She testified that, when she went to bed, the victim and the Defendant were in the living room. The Defendant was watching television, and the Defendant said "[h]e wanted to spend some time with his son."

Ms. Perkins said that, when she awoke the next morning around 10:00 or 10:30 a.m., the victim was "[i]n his bassinet, not breathing." She said she hollered for the Defendant, who was awake in the living room. She testified that it took him ten or fifteen minutes to come into the bedroom. Ms. Perkins stated that when the Defendant eventually came into the room, "[h]e grabbed Matthew up, take him in the living room, put him on the couch and

I called 911." She said that she and the Defendant tried to carry out the CPR instructions she was given over the phone.

Ms. Perkins said that, when she saw that her baby was not breathing, she was "very upset" and cried. She recalled that the Defendant did not seem to be upset, nor did he cry. Ms. Perkins said that, when the ambulance left, she called the Defendant's parents to tell them that the victim was not breathing and was being taken to the hospital. She said that, after the ambulance left, the Defendant did not come out of the apartment right away and that she had to wait for him, in his truck, for fifteen or twenty minutes.

Ms. Perkins testified that she was very upset when the hospital personnel told her that the victim was dead, but that the Defendant "acted like he was calm." She recalled that, at the victim's funeral, the Defendant "pulled Matthew's top up and showed [her] where they done an autopsy at." She testified that she "passed out" and missed part of her son's funeral.

Ms. Perkins said that the Defendant never told her that he had another child. She testified that she did not do anything to harm her child, but that she did not see the Defendant do anything to harm the victim either.

On cross-examination, Ms. Perkins maintained that she walked approximately eight miles from her apartment to the Defendant's mother's house. When asked how she was able to do that when she was still in pain from her C-section, Ms. Perkins replied, "But I wasn't going to let my son go without diapers. My son comes first."

Defense counsel also confronted Ms. Perkins about many prior inconsistent statements she had made. During the trial, she testified that the medication she took "knocked [her] out" and that she did not wake up during the night to feed the victim, even though it was her turn. She admitted that she lied to Tennessee Bureau of Investigation (TBI) Special Agent Luke Mahonen on two prior occasions—once when she told him that she woke up at 4:00 or 5:00 a.m. to feed the victim and once when she told him that she awoke at 3:00 a.m. She also admitted that she lied during a previous court proceeding when she said that she woke up at 4:00 or 5:00 a.m. to feed her son. When asked why she lied in court, Ms. Perkins responded, "[B]ecause I was afraid for my life, because my husband, after we was married for two years, he threatened to kill me." She admitted that she lived with the Defendant until October 2006, but explained, "[B]ecause he threatened and threatened and threatened to kill me."

Ms. Perkins also admitted to lying in previous court proceedings when she said that she woke up at 3:30 or 4:00 a.m. to feed the victim. She acknowledged that she told Special Agent Mahonen that she woke up at 3:00 a.m., and then at 6:00 a.m., to feed the victim and

change his diaper. When asked if she previously testified that her son was not breathing at 3:00 a.m., Ms. Perkins said she "remember[ed] nothing about it."

Ms. Perkins said that she did not remember saying in a previous court proceeding that she did not take any medication on the night of August 17, 2006. However, she then said that she was not in pain when she went to sleep, but woke up in pain around 11:30 p.m. and took medication. Later on, though, she testified, "I was planning on just laying down to see if I could quit hurting, because I was hurting real bad, and I ended up sleeping to 11:30."

Ms. Perkins also testified that the Defendant went to "most" of the parenting classes at the hospital, and she said that she lied when she previously testified that he did not go to any of the classes. Ms. Perkins admitted that she did not begin to accuse the Defendant of hurting the victim until Special Agent Mahonen confronted her with the notion that it was either her or the Defendant who did.

Elizabeth Smith, a registered nurse who was working at the Rhea County Medical Center on August 18, 2006, testified that, "around 11-ish," 911 operators transferred Ms. Perkins' call to her so that she could give Ms. Perkins instructions on how to perform CPR. She said that Ms. Perkins relayed the instructions to the Defendant. Ms. Smith recalled that she asked Ms. Perkins when the last time was that she saw the victim breathing and that Ms. Perkins "said that she had slept through the night, and it was about 10 o'clock the night before." Ms. Smith testified that Ms. Perkins sounded panicked and worried. Ms. Smith said that the paramedics brought the victim to the hospital and that the Defendant signed the consent forms for treatment, and then left.

Kimberly Boles testified that, in August 2006, she lived in the same apartment building as the Defendant and Ms. Perkins. She recalled that, around 9:00 p.m. on August 17, 2006, when the Defendant and Ms. Perkins arrived home with the victim, she met them outside and held the victim. She then went up to their apartment for a little while, leaving at approximately 9:30 p.m. Ms. Boles said that she did not observe any bruising on the victim's scalp or forehead when she saw him that night.

She stated that, the next morning, she saw a fire truck at the apartment complex and went outside to see what was happening. Ms. Boles testified that Ms. Perkins told her that she called an ambulance because when she woke up, the victim was not breathing. Ms. Boles said that Ms. Perkins "was very upset," but that the Defendant "seemed to be okay." She recalled that Ms. Perkins later called her from the hospital and described, "She was very upset, and she said the baby didn't make it and she wished that she was dead. She wished somebody would shoot her."

A transcript of the previous testimony of Raymond Stinnett, a paramedic who worked for Rhea Medical Services, was read to the jury. Mr. Stinnett said that, on August 18, 2006, he responded to a call for an infant who was not breathing. He stated that his records indicated that he arrived at the scene at 11:40 a.m. He said that the police and fire department were already on the scene and that, when he went into the apartment, he observed a male performing CPR on the victim. Mr. Stinnett testified that he did not see the man's face and, thus, could not say if it was the Defendant.

Mr. Stinnett stated that the victim was "very pale," and had no heartbeat or any other signs of life. He recalled that he noticed bruising on the victim's head and forehead. He said that he saw blood on the bottom of the victim's left foot and by his mouth. Mr. Stinnett testified that, when he intubated the victim, he found that the victim had blood in his oral pharynx, which is the upper part of his airway. He testified that he asked when the last time the victim was seen alive and "was informed that the last time the infant was seen alive was when it was put to bed the night before."

Dr. Amy McMaster testified that, on August 19, 2006, she performed an autopsy on the victim. She said that the victim had multiple blunt force injuries to his head, neck, and torso. Later, she elaborated that "the vast majority" of the victim's scalp was covered with bruising. Dr. McMaster also described the victim's internal injuries as follows:

> Matthew also had extensive injuries on the inside of his body. He had bruising extensively beneath his scalp and extending on to the back portion of his neck. He had bleeding and swelling of the brain. He also had bleeding around different parts of his spinal cord. He had multiple rib fractures both in the front of the chest and in the back of the chest. He had bleeding in his abdominal tissue and of the diaphra[g]m, and your diaphra[g]m is your breathing muscle that sits in the lower portion of the chest or upper abdomen. He had bleeding around that. He had bleeding around one of the organs called the adrenal gland, which is a gland that sits above the kidney, so he had multiple areas of bleeding and injury and rib fractures.

Dr. McMaster also stated that the victim had bleeding at the back of his eyes. She described his injuries as "extensive and severe" and equated them with the type of injuries received in a fatal car wreck or by a fall from a second-or-third story window. When asked to compare the victim's injuries with other cases of child abuse she has seen, Dr. McMaster said, "On a spectrum of children that I've seen that have been abused, this would certainly be on the worst end of the spectrum of injuries that I've seen in my experience."

She stated that she determined the victim's cause of death was multiple blunt force trauma injuries and that the manner of death was homicide. Dr. McMaster said that she determined that the victim was "[a]ssaulted by another person or persons." She testified that the injuries that the victim received were not accidental, nor could they have been caused by the victim himself. She stated that the victim could not have sustained these type of injuries by falling off of a couch or by being dropped by someone who was holding him. When asked if the victim could have sustained the injuries by someone grabbing his legs and ramming his head into a table, she answered, "That could explain some of the injuries, yes." She also said that the rib fractures could have been sustained if someone squeezed the victim as hard as they could. Dr. McMaster stated that some of the trauma to the victim's head also could have been caused by swinging him and hitting his head on a hard object. She testified that the injuries that the victim sustained were not consistent with shaken baby syndrome. She recalled that, aside from the injuries the victim sustained, she did not find any congenital abnormalities and that the victim "appeared to be healthy."

Regarding how long the victim survived after the injuries were inflicted, Dr. McMaster said that it was difficult to estimate. She stated that the victim "live[d] long enough to have some brain swelling. That is not immediate. Sometimes that happens over a period of minutes to hours." She later stated, "[T]he type of head injury that Matthew had, I would expect the child to be immediately symptomatic and death to possibly follow within a few minutes to up to a couple of hours later." She testified that the victim would have experienced pain with his injuries.

Dr. James Nelson, a pediatrician, testified that he examined the victim on August 14, 2006, when the Defendant and Ms. Perkins brought him in for a "well-baby check." He said that the victim appeared to be healthy and that he did not observe any bruising on the victim.

Special Agent Mahonen testified that he responded to the Rhea County Medical Center while the victim's body was still there. He said that he photographed the victim's body and that he then proceeded to the residence of the Defendant and Ms. Perkins. He recalled that the Defendant then voluntarily drove to the police station, where he subsequently gave a statement at approximately 3:15 p.m.

The jury heard an audio recording of the Defendant's August 18, 2006 interview. In the interview, the Defendant said that the victim was born six-weeks premature on July 29, 2006, and that the victim was released from the hospital on August 12, 2006. The Defendant explained that they stayed at his mother's house until August 17, 2006, when he and Ms. Perkins brought the victim to their apartment.

-7-

That night, the Defendant said that both he and his wife went to sleep around 9:00 or 10:00 p.m. and that she slept in the bedroom, while he slept on the couch in the living room. He said that the victim was in the bassinet in the bedroom. He said that his wife fed the baby during the night and that he did not wake up at all during the night. The Defendant claimed that, when he checked on the victim around 9:00 a.m., he was fine. He also said that he woke his wife up at that time, but that "[s]he laid back down after we checked on him." The Defendant stated that, around 10:30 or 11:00 a.m., his wife noticed that the victim was not breathing and she "hollered" for him. The Defendant denied doing anything to cause the victim's injuries.

Special Agent Mahonen testified that, after the interview, he searched the Defendant's apartment with the Defendant's permission. He said that he found an empty Percocet prescription pill bottle on the floor in the bedroom. Special Agent Mahonen testified that the label indicated that it was the Defendant's prescription. He later admitted that he did not ask either the Defendant or Ms. Perkins to submit to a drug test.

Special Agent Mahonen also said that he interviewed the Defendant again on August 24, 2006. A transcript of the interview was read to the jury. At first, the Defendant maintained that he and his wife went to sleep around 9:00 or 10:00 p.m. on August 17, 2006. Then, the Defendant said that he stayed up until about 2:30 a.m. He said that he heard his wife feeding the victim in the bedroom at around 1:30 a.m. He also said that, before he went to sleep at 2:30 a.m., he looked into the bedroom and saw that his wife and the victim were "alright." When asked who hurt his son if he did not, the Defendant responded, "Like I said I don't have a clue who hurt my son. I don't know if it was my wife or who it was. It sure wasn't me that hurt my son."

The Defendant testified in his own defense. He said that he was "very happy" when his wife informed him that she was pregnant. He recalled that he never missed any of the parenting classes at the hospital. The Defendant stated that, when he, Ms. Perkins, and the victim stayed at his mother's house from August 12-17, 2006, both he and his wife cared for the victim, although he admitted that he did most of it.

The Defendant testified that he was diagnosed with multiple sclerosis in 2003 and that he was prescribed Percocet for his illness. However, he said that he did not take any Percocet the night of August 17, 2006, that he kept all of his pill bottles in a locked box, and that he did not take out the pill bottle found in the bedroom.

The Defendant testified that he gave the victim a bath at his mother's house on the evening of August 17, 2006. He said that, when he, his wife, and the victim got to their apartment, his wife washed the victim again with a damp cloth. He recalled that she then fed

the victim and lay him in his bassinet in the bedroom. The Defendant testified that Ms. Perkins went to sleep in the bedroom, while he lay on the couch. He stated that, sometime between 10:00 and 11:00 p.m., he started watching a movie but dozed in and out. He testified that, around 1:00 or 2:00 a.m., he awoke and checked on his wife and son by standing in the hallway and peering into the bedroom. The Defendant recalled that he did not notice anything out of the ordinary. He said that he did not hear his wife or the victim during the night.

The Defendant said that he then went to sleep on the couch and did not wake up until Ms. Perkins "came in screaming" that the victim was not breathing around 10:30 or 11:00 a.m. The Defendant stated, "I went in there and got him up out of the bassinet and checked and he wasn't breathing, so I had her call 911." The Defendant said that his wife relayed him the CPR instructions she received from the 911 operator and that he performed CPR on the victim. The Defendant recalled that he was "hurting badly" when the doctor at the hospital informed him that the victim died. He said that he and his wife both cried. He denied harming the victim in any way. The Defendant denied lifting up the victim's shirt at his funeral. He further said that his wife "seemed fine" during the funeral.

On cross-examination, the Defendant acknowledged that, after Ms. Boles left their apartment around 9:30 p.m. on August 17, 2006, he and his wife were alone in the apartment with the victim until Officer Jackson arrived the next morning in response to their 911 call. He admitted that no one else had the opportunity to harm the victim that night besides him and his wife. The Defendant also acknowledged that the victim was not bruised or injured at the time Ms. Boles left their apartment.

When confronted with Ms. Perkins' testimony that the Defendant accused her of carrying another man's baby when she told him she was pregnant, the Defendant did not deny making the comment and said that it was made "jokingly." The Defendant also testified that his wife was aware that he had a child from a previous marriage.

The Defendant said that he was providing most of the victim's care. He stated that he attended all of the classes given at the hospital about caring for a baby, but that his wife missed one or two because she was still sore from the C-section.

The Defendant acknowledged that there was an inconsistency between one of his statements to Special Agent Mahonen and his testimony at the trial. He admitted that he told Special Agent Mahonen that he woke up around 9:00 a.m. and checked on the victim.

Gracie Thomas testified that she lived next to the Defendant's parents in Sale Creek and had known the family for over forty years. She said that she observed that the Defendant

provided most of the victim's care. Ms. Thomas testified that she saw Ms. Perkins hold the victim and that "she just carried [the victim] up in her arm and left its head hang over." She also said that Ms. Perkins told her that she got up and fed the victim one time the night that he died. Ms. Thomas said that she asked Ms. Perkins whether the Defendant hurt the victim and that Ms. Perkins said he did not.

Kenneth Poe, the Defendant's brother, testified that Ms. Perkins told him that "she woke up a couple of hours during the night to feed [the victim], and it was a pretty good while before she fed him again." On cross-examination, Kenneth Poe said that both the Defendant and Ms. Perkins were loving parents to the victim. He agreed that Ms. Perkins had a "pretty significant disability" and that it was difficult for her to walk and talk. He also agreed that she was not well-coordinated or real strong and that she would have had a hard time picking up the victim by his feet and throwing him across the room. However, on re-direct, Kenneth Poe said that it would not surprise him that Ms. Perkins walked ten miles.

Elizabeth Blackstock, the Defendant's mother, testified that the Defendant, Ms. Perkins, and the victim stayed at her house for several days after the victim was released from the hospital. She said that the Defendant was the victim's primary caregiver and that "[h]e bathed the baby all the time, and fed the baby most of the time." She testified that she went to the hospital after Ms. Perkins notified her that the victim was being taken there, and she said that the Defendant "was very sad and tore up" and that he was crying.

Bobby Poe, the Defendant's father, testified that on August 16, 2006, he witnessed Ms. Perkins grab the victim by the left arm and pull him out of the swinging chair he was sitting in. He also said that she then "got him and throwed him over under her arm." He said that the victim's head shook as Ms. Perkins moved, so he intervened and offered to watch the victim while Ms. Perkins rested. He said she replied, "I wished you would." Bobby Poe also testified that he observed the Defendant crying at the hospital on August 18, 2006.

The proof at the Defendant's trial closed on the afternoon of July 22, 2009. The next morning, before jury instructions and closing arguments, the trial court received notification from a court officer that, during dinner the night before,[2] she overheard one of the jurors making a comment about the trial to another juror. The trial court held a hearing regarding the issue.

The court officer, Brenda Sturgil, testified that she heard one of the jurors comment that "[s]he hadn't made her mind up. She didn't know what she was going to do." Ms. Sturgil also said that the juror expressed concern about the cameras in the courtroom and

---

[2] The jurors were sequestered.

-10-

"was worried just about being identified and someone coming after her." Ms. Sturgil said that only she and the other juror could have heard the comment because the restaurant was loud and because most of the other jurors had gone outside to smoke. Ms. Sturgil also said that the other juror did not say anything in response to the comment.

The trial court stated that it was going to bring in the juror who made the comment and question her. However, defense counsel responded, "I would object to individually inquiring of a juror about that. I believe that it was improper. It may have influenced another juror, and move for a mistrial." When the State proposed making the two jurors involved in the conversation the alternate jurors, defense counsel said that he thought the only remedy was to declare "a mistrial and start over." The trial court agreed with the State's suggestion and said that the remaining twelve jurors would deliberate. The trial court brought the two jurors into the courtroom and told them that they "have been selected not to deliberate in this matter." The two jurors were then taken into a separate room, away from the remaining jurors. Additionally, when the other twelve jurors returned to the courtroom for jury instructions, the trial court assured them that the reporters were not taking pictures of the jury members.

On July 23, 2009, the jury convicted the Defendant of first degree felony murder and aggravated child abuse, and they imposed a $50,000 fine for the latter offense. The trial court conducted the Defendant's sentencing hearing on September 4, 2009. On September 17, 2009, the Defendant was sentenced to life in prison for his first degree felony murder conviction and to twenty-five years as a violent offender for his aggravated child abuse conviction. The trial court ordered that his sentences run consecutively. The Defendant now appeals.

## Analysis
### I. Motion for Judgment of Acquittal
The Defendant contends that the trial court erred when it denied his motion for judgment of acquittal, which was made at the conclusion of the State's proof and renewed at the close of all proof. He argues that the State presented no evidence that he was the perpetrator of the crime and that the evidence presented implicated him no more than it did Ms. Perkins.

On appellate review of a denial of a motion for judgment of acquittal, we apply the same standard as a question of the sufficiency of the convicting evidence. See State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the

-11-

sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Aggravated child abuse is committed when a person "commits the offense of child abuse, as defined in § 39-15-401(a) . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1) (2006). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . ." Tenn. Code Ann. § 39-15-401(a) (2006). First degree felony murder includes "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." Tenn. Code Ann. § 39-13-302(a)(2) (2006). "No culpable mental state is required for conviction . . . except the intent to commit the enumerated offense[]." Tenn. Code Ann. § 39-13-202(b) (2006).

Dr. McMaster testified that the victim sustained multiple blunt force injuries to his head, neck, and torso. She said that the victim had bleeding and swelling of his brain, as well as bleeding around his spinal cord, abdominal tissue, diaphragm, adrenal gland, and at the back of his eyes. Dr. McMaster also reported that the victim had sustained multiple rib fractures. She said that his injuries were "extensive and severe" and that it was one of the worst cases of child abuse she had seen in her career. She testified that the injuries the victim sustained were comparable with those received in a fatal car wreck or a fall from a second- or third-story window. Dr. McMaster determined that the victim's cause of death was multiple blunt force trauma injuries and that the manner of death was homicide. She also

said that the victim was "[a]ssaulted by another person or persons" and that his injuries were not accidental or self-inflicted.

The proof demonstrated that only the Defendant and Ms. Perkins were with the victim between 9:30 p.m. on August 17, 2006, and 11:40 a.m. on August 18, 2006, the time period during which the victim sustained his injuries. In fact, even the Defendant conceded that no one else had the opportunity to harm the victim besides him and his wife. Ms. Perkins also testified that, when she went to bed on August 17, 2006, the victim and the Defendant were in the living room watching television. She recalled that the Defendant said "[h]e wanted to spend some time with his son." She said that she took Percocet with her epilepsy medication, that the combination made her drowsy, and that she slept through the night. Although the jury heard of Ms. Perkins' many prior inconsistent statements, she testified that she lied because she was afraid for her life and that the Defendant threatened to kill her.

The Defendant testified that he suffered from multiple sclerosis, but he also testified that he provided most of the victim's care. Ms. Perkins said that she had undergone an emergency C-section on July 29, 2006, and was still sore from the operation at the time of the victim's death. Additionally, it was revealed that Ms. Perkins had a "pretty significant disability," and even the Defendant's brother testified that it was difficult for Ms. Perkins to walk and talk. He also agreed that Ms. Perkins was not well-coordinated or very strong and would have a hard time picking the victim up by his feet and throwing him across the room.

Moreover, the jury heard much circumstantial evidence about the demeanor of both the Defendant and Ms. Perkins. Officer Jackson described the Defendant's demeanor at the scene as "calm" and said that he never saw the Defendant cry or lose his composure. He also noted that the Defendant never asked him which hospital the paramedics were taking his son to. However, he testified that Ms. Perkins "was pretty hysterical" and that she did ask him where paramedics were taking her son. Ms. Boles also testified that, at the time the first-responders were at the scene, Ms. Perkins "was very upset," but that the Defendant "seemed to be okay." Ms. Smith testified that Ms. Perkins sounded panicked and worried when she called 911 for help. Ms. Perkins testified that the Defendant "acted like he was calm" at the hospital when they were informed that their son had passed away.

After our review of the evidence in the light most favorable to the State, we conclude that sufficient evidence was presented for any rational trier of fact to find beyond a reasonable doubt that the Defendant committed the offenses of first degree felony murder and aggravated child abuse. The Defendant is not entitled to relief on this issue.

## II. Jury Issues

The Defendant contends that the trial court erred when it failed to grant a mistrial after it was discovered that one juror had made comments about the trial to another juror. Additionally, he asserts that the trial court erred by not inquiring whether the other jurors heard the comment and by failing to disable or remove the televisions and radios from the jurors' motel rooms.

**A. Mistrial**

Initially, we note that "[a] mistrial is usually appropriate in a criminal case only where there is a 'manifest necessity.'" State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (quoting Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Id. An abstract formula should not be applied mechanically in determining whether a mistrial was necessary, and all relevant circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993). Whether a mistrial should be granted is a determination left to the sound discretion of the trial court. State v. Reid, 164 S.W.3d 286, 342 (Tenn. 2005) (citing State v. Smith, 871 S.W.2d 667, 672 (Tenn. 1994)). The trial court's decision should not be overturned absent an abuse of discretion. Id. Additionally, the party arguing that a mistrial should have been granted bears the burden of establishing its necessity. Id. (citing Williams, 929 S.W.2d at 388).

After the court officer informed the trial court what she overheard one juror say to another at dinner the night before, the trial court said that it was going to bring in the juror who made the comments and question her. The following exchange subsequently occurred:

> DEFENSE COUNSEL: For the record, I guess I—personally, I don't really care, but what we're doing is we're focusing on an issue that should this juror become, or stay as part of the 12 that decide the case, we're adding significance to the statement. I would object to individually inquiring of a juror about that. I believe it was improper. It may have influenced another juror, and move for a mistrial.
>
> TRIAL COURT: Well, I have to be given an opportunity, counsel, to cure the situation. We can't do it in a vacuum.
>
> DEFENSE COUNSEL: I understand.
>
> TRIAL COURT: In other words, we have the testimony of the driver and—

PROSECUTOR: Your Honor, I would like that on the record what defense counsel is asking, basically, because we have the option of using those two as the alternates and still having 12 folks, so if he's saying—it wouldn't be grounds for a mistrial if those two were excluded as the alternates, we're fine. And if that's what he's asking, that's what we can do. I want defense counsel to say what his remedy is on the record before we question anybody.

TRIAL COURT: What do you say, [defense counsel]? That is an option. Simply the proof that I have before me is that the conversation was overheard between those two jurors, and one of the options would be simply to remove those two jurors and use the 12 remaining, so you tell me what you think the proper remedy should be. Go ahead and tell me what you think the remedy should be. Are you satisfied with me removing those two jurors, or do you wish some other proposed remedy?

DEFENSE COUNSEL: Your Honor, I don't think that those two choices are the only remedy.

TRIAL COURT: Well, tell me what you think the remedy or remedies are.

DEFENSE COUNSEL: Just a mistrial and start over.

TRIAL COURT: Well, I'm not going to grant you a mistrial at this point in time, so I'm asking you if you have any suggestion past just declaring a mistrial, how to handle what's before me.

DEFENSE COUNSEL: No, sir, just a mistrial. You have to understand I'm just building a record. I don't have a solution.

TRIAL COURT: Well, I understand what you're doing.

DEFENSE COUNSEL: We're in a dilemma at this point. If we bring her in, we're going to add significance to what has happened, and if we don't bring her in, we're worrying about what could take place. The only thing I know is just move for a mistrial.

PROSECUTOR: If counsel is not going to agree to a remedy just so he can protect the record, Your Honor, then I think your only option, because he's going to object, regardless of what you do he's going to object.

-15-

TRIAL COURT: What's the state's proposal?

PROSECUTOR: Your Honor, we have no issue to proceed with the 12 that we have, and let's don't question anybody. If he's going to object to that he can do that.

TRIAL COURT: Counsel, that's the remedy. I'm going to call those two jurors in and I'm going to excuse those two jurors and we'll proceed with the other 12.

The trial court then brought in the two jurors and said, "Ladies, the two of you have been selected not to deliberate in this matter, so we're going to keep you separate."

After our review, we conclude that the trial court did not err when it failed to declare a mistrial. The trial court had only the testimony of Ms. Sturgil to consider when it ruled on the Defendant's request for a mistrial, because the Defendant objected to questioning the juror who made the comment. Ms. Sturgil testified that, during dinner the night before, she sat at a booth in a restaurant with two female jurors. She recalled that one juror commented that "[s]he hadn't made her mind up" and, because there were cameras in the courtroom, she was worried about being identified and that someone could come after her. Ms. Sturgil said that only she and the other juror sitting in their booth could have heard the comments because the restaurant was loud, the juror who made the comment was soft-spoken, and most of the other jurors had gone outside to smoke. After hearing this, the trial court told the two jurors that they had been chosen not to deliberate on the case and separated them from the remaining twelve jurors before the closing arguments and jury instructions were given. In essence, the two jurors were treated as excused alternate jurors. We conclude that, given these circumstances, there was no "manifest necessity" for the trial court to declare a mistrial. The Defendant is not entitled to relief on this issue.

**B. Questioning the Remaining Jurors**

In his brief, the Defendant argues as follows:

[The Defendant] submits that due process in this case required that the trial court hold a hearing in some fashion to determine the existence of prejudice of the other twelve jurors. Once, the court determined that there was sufficient cause to dismiss two jurors for the reasons which occurred in this trial the burden shifted to the [S]tate to substantiate the conduct or establish its harmless nature. The only way to establish its harmless nature relative to remaining jurors was to at least make brief inquiry of the remaining panel.

As authority for his argument, the Defendant quotes State v. Parchman, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997), in which this Court stated, "If it is shown that one or more jurors has been exposed to extraneous prejudicial information or improper influence, there arises a rebuttable presumption of prejudice, and the burden then shifts to the prosecution to explain the conduct or to demonstrate the harmlessness of it." However, the Defendant's argument that the State carries the burden of showing the juror's conduct was harmless is misplaced.

The record does not indicate that it was "shown that one or more jurors ha[d] been exposed to extraneous prejudicial information or improper influence." See id. "'Extraneous information' is information from a source outside the jury." Carruthers v. State, 145 S.W.3d 85, 92 (Tenn. Crim. App. 2003). In Caldararo v. Vanderbilt University, the Court of Appeals summarized external and internal influences as follows:

> External influences that could warrant a new trial if found to be prejudicial include: (1) exposure to news items about the trial, (2) consideration of facts not admitted in evidence, and (3) communications with non-jurors about the case. Internal influences that are not grounds to overturn a verdict include: (1) discussions among jurors, (2) intimidation or harassment of one juror by another, (3) a juror's personal experiences not directly related to the litigation, and (4) a juror's subjective thoughts, fears, and emotions.

794 S.W.2d 738, 742 (Tenn. Ct. App. 1980) (internal citations omitted). Moreover, in State v. Frazier, 683 S.W.2d 346, 353 (Tenn. Crim. App. 1984), this Court noted that the alleged discussions about the case amongst the jurors prior to the close of the proof was not "extraneous prejudicial influence" or "outside influence."

We reject the Defendant's argument that the trial court should have sua sponte questioned the other jurors about the existence of prejudice. First, the Defendant did not request that the other jurors be questioned. In fact, he objected to questioning the juror who made the comments because he did not want "to add significance" to what happened. Second, given Ms. Sturgil's testimony, there was no indication that any of the remaining jurors heard the comments at issue and were, therefore, prejudiced by it. Additionally, as the juror's comments did not amount to "extraneous prejudicial information or improper influence," we reject the Defendant's assertion that the burden shifted to the State to show that the comments were harmless. The Defendant is not entitled to relief on this issue.

### C. Televisions and Radios in Jurors' Motel Rooms

The trial court repeatedly instructed the jurors that they were not allowed to watch the local Chattanooga television stations at all and that they should turn off their televisions by 9:00 p.m. However, the Defendant argues that the trial court erred "when it failed to insure

that the jury would not be subjected to news media coverage by disabling or removing television and radio media in the motel rooms in which the jury stayed while being sequestered." There is no indication in the record that the Defendant requested that the televisions and radios be disabled or removed from the jurors' motel rooms. Thus, this issue is waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

## III. Sentencing Issues

The Defendant asserts that the trial court incorrectly applied two enhancement factors and failed to apply one applicable mitigating factor when it sentenced him to twenty-five years for his aggravated child abuse conviction. He also contends that the consecutive sentences the trial court imposed are excessive and that he should receive jail credit for the time he served after his probation was revoked on a previous conviction.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

## A. Enhancement and Mitigating Factors

The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

The trial court found that the following enhancement factors applied to the Defendant: (1) The Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (4) A victim of the offense

was particularly vulnerable because of age or physical or mental disability; (5) The Defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense; (8) The Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and (14) The Defendant abused a position of public or private trust. See Tenn. Code Ann. § 40-35-114(1), (4), (5), (8), (14). The trial court did not apply any mitigating factors. Regarding the enhancement factors that the trial court found, the Defendant only contests the application of factors (1) and (5).

The trial court considered two prior convictions when it applied enhancement factor (1) to the Defendant. In 2002, following a jury trial, the Defendant was convicted of child abuse, a Class D felony, against his other son, who was twelve days old at the time of the offense. See State v. Michael Wayne Poe, No. E2003-00417-CCA-R3-CD, 2004 WL 1607002, at *1 (Tenn. Crim. App., Knoxville, July 19, 2004). The Defendant was also convicted of driving under the influence in 1995. Thus, because he had a previous history of criminal convictions, we cannot conclude that the trial court erred by finding that enhancement factor (1) applied to the Defendant.

The trial court also found that the Defendant treated the victim with exceptional cruelty during the commission of the offense. In its written order, the trial court noted, "The proof at trial in the form of expert testimony, lay testimony, and photographs clearly established that 20-day-old Matthew Poe was brutally beaten, yet survived for a period of time after some of the injuries were inflicted. Without question, the [D]efendant treated Matthew with exceptional cruelty." However, the Defendant argues that the trial court erred in finding this factor applied because "[t]here was no concrete proof that the victim survived for a period of time after the injuries were inflicted." We disagree.

Dr. McMaster said that it was difficult to estimate how long the victim survived after the injuries were inflicted, but she said that the victim "live[d] long enough to have some brain swelling. That is not immediate. Sometimes that happens over a period of minutes to hours." She later stated, "[T]he type of head injury that Matthew had, I would expect the child to be immediately symptomatic and death to possibly follow within a few minutes to up to a couple of hours later." She testified that the victim would have experienced pain with his injuries. Dr. McMaster also testified that she had performed at least 2,000 autopsies and that the injuries inflicted on the victim were among the worst she had seen in her career. Thus, after reviewing the record, we cannot conclude that the trial court erred when it found that the Defendant treated the victim with exceptional cruelty during the commission of the offense.

-20-

Finally, the Defendant claims he has multiple sclerosis and that the trial court should have considered that and applied mitigating factor (13). See Tenn. Code Ann. § 40-35-113(13) ("Any other factor consistent with the purposes of this chapter."). However, we cannot conclude that the trial court erred by not considering the Defendant's uncorroborated claims about his medical condition as a mitigating factor. The presentence report contains a multitude of the Defendant's medical records and none of them indicate that the Defendant has been diagnosed with multiple sclerosis, as he asserts. In fact, the trial court found that the Defendant had been "untruthful about his . . . medical condition." After our review of the record, we conclude that the trial court did not err when it failed to apply a mitigating factor based on the Defendant's assertions about his medical condition. Thus, the Defendant is not entitled to relief on this issue.

**B. Consecutive Sentencing**
The trial court ordered that the Defendant's twenty-five-year sentence for aggravated child abuse be serve consecutively to his life sentence for first degree felony murder. The Defendant now appeals.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
(2) The defendant is an offender whose record of criminal activity is extensive;
(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. We note that the trial court found that factors (4) and (6) applied, although the Defendant only challenges the application of factor (4).

Regarding the imposition of consecutive sentences because the defendant is a "dangerous offender," our supreme court has held, "The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). The Defendant argues that "[t]he trial court did not find that . . . the terms imposed are reasonably related to the severity of the offenses committed [and] therefore the sentences should have been run concurrently." We cannot agree.

In its order imposing consecutive sentences, the trial court stated as follows:

The court finds the following factors from [Tennessee Code Annotated section] 40-35-115 and State v. Wilkerson, 905 S.W.2d 933, weighing in favor of consecutive sentencing:

**(4) The court finds the [D]efendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.** While the record is devoid of particulars, it does establish the [D]efendant abused his first son, Taylor Poe. The proof at trial revealed the [D]efendant brutally murdered his second son, Matthew, on the first night that he and the child's mother resided alone in their apartment with the child. Such behavior establishes the [D]efendant is a dangerous offender who has little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The circumstances surrounding the commission of this offense are aggravated due to the extreme youth of the child, the cruel treatment, and the position of trust which the [D]efendant occupied. The [D]efendant has only been sporadically employed, and has been untruthful about his employment and medical condition. Society should be protected from an individual who is unwilling to lead a productive life and whose despicable crimes against the most defenseless of all human beings show him to be anti-social, and one who should be confined for an extended period of time.

-22-

Although the trial court did not explicitly state that the sentence imposed was reasonably related to the severity of the offenses committed, when we examine the totality of the trial court's statements we are satisfied that it made the requisite findings. Not only did it cite to State v. Wilkerson, 905 S.W.2d 933, the trial court commented that the "[D]efendant brutally murdered" the victim and that the circumstances of the offense were "aggravated due to the extreme youth of the child, the cruel treatment, and the position of trust which the [D]efendant occupied." Thus, we reject the Defendant's argument that the trial court did not make the findings necessary to support the imposition of consecutive sentences. The Defendant is not entitled to relief on this issue.

### C. Jail Credit

The Defendant argues that the judgment forms the trial court entered did not reflect the proper amount of jail credit. Our review of the record has allowed us to piece together the following chronology of events. On October 4, 2006, the Defendant was arrested for the charges underlying this appeal. His bond was set at $100,000 on October 6, 2006. On October 12, 2006, the Defendant was released from the Rhea County Jail on bond. That same day, a Hamilton County court ordered that a probationary capias be issued because the Defendant violated the terms of his probation stemming from his 2002 child abuse conviction. On October 13, 2006, approximately eight hours after he posted bond, the Defendant was arrested for violating his probation. His Hamilton County probation was revoked on November 6, 2006, and he was ordered to serve the remainder of his sentence in the penitentiary. On November 9, 2006, the Defendant filed a Petition to Approve Surrender, requesting "[t]hat he be allowed to surrender himself to the sheriff of Rhea County [and] that his bond premium ($8,000.00) be returned so that he may hire private counsel." On January 12, 2007, the trial court granted the Defendant's request.[3]

The trial court's judgment form for the Defendant's first degree felony murder conviction reflects that the Defendant received jail credit from October 4, 2006 to October 12, 2006, and also from January 1, 2009 to September 17, 2009. In this appeal, the Defendant argues that he should have received additional jail credit for the time he spent in the penitentiary serving his Hamilton County sentence because he surrendered his bond for the instant charges.

Tennessee Code Annotated section 40-23-101 (c) provides as follows:

---

[3] We note that the record is not clear when the Defendant finished serving his sentence from Hamilton County. However, arguments during the sentencing hearing indicate that, after finishing his sentence, he was mistakenly released from custody. The Defendant subsequently surrendered to Rhea County officials on January 1, 2009.

*The trial court shall*, at the time the sentence is imposed and the defendant is committed to jail, the workhouse or the state penitentiary for imprisonment, render the judgment of the court so as to *allow the defendant credit on the sentence for any period of time for which the defendant was committed and held* in the city jail or juvenile court detention prior to waiver of juvenile court jurisdiction, or county jail or workhouse, *pending arraignment and trial*. The defendant shall also receive credit on the sentence for the time served in the jail, workhouse or penitentiary subsequent to any conviction arising out of the original offense for which the defendant was tried.

(emphasis added). In State v. Watkins, we noted that "[t]he purpose of the pretrial jail credit statute is to treat those unable to make bail in much the same manner as those that are." 972 S.W.2d 703, 705 (Tenn. Crim. App. 1998). However, a defendant is only entitled to pre-trial jail credit "against a sentence if the reason for the incarceration arises from the offense for which the sentence was imposed." State v. Timothy S. Bradley, No. 01C01-9804-CC-00165, 1999 WL 155916, at *2 (Tenn. Crim. App., Nashville, Mar. 23, 1999) ("Appellant is not entitled to pre-trial jail credit in this case because the reason for his confinement in the Dickson County Jail arose from the Dickson County offenses and not the Humphreys County offenses for which Appellant was sentenced in this case."); see also State v. Earl D. Mills, No. E2004-01218-CCA-R3-CD, 2005 WL 1551339, at *3 (Tenn. Crim. App., Knoxville, July 5, 2005) (finding that a defendant convicted of vehicular homicide was not entitled to jail credit for the time he served for an unrelated violation of probation); State v. Michael Bikrev, No. M2001-01620-CCA-R3-CD, 2002 WL 170734, at *7 (Tenn. Crim. App., Nashville, Feb. 4, 2002) (holding that a defendant who was serving time for a violation of probation was not entitled to jail credit toward his sentence for another offense); State v. Abernathy, 649 S.W.2d 285, 286 (Tenn. Crim. App. 1983) (rejecting the defendant's argument that he should receive jail credit and noting that the time he spent in jail "was not time served arising out of or in relation to his robbery conviction"); Majeed v. State, 621 S.W.2d 153, 155 (Tenn. Crim. App. 1981) ("[W]e conclude that it cannot be legitimately argued that the defendant's jail time in Florida should be credited on his Tennessee escape sentence. He was not "committed and held" in Florida regarding this escape charge, except for the eleven (11) day interim between the disposition of the Florida charges and his return to Tennessee, and he has been credited for that time."); Trigg v. State, 523 S.W.2d 375, 376 (Tenn. Crim. App. 1975) (rejecting a defendant's claim that he should receive jail credit on his Tennessee sentence for his confinement in federal court and noting, "He was deprived of his liberty for exactly the same reason while awaiting disposition of the Tennessee case as he would have been if able to make bond on the latter charge. It is only when the time spent in jail or prison is due to or, as the statute says, 'arises out of' the offense for which the sentence against which the credit is claimed that such allowance becomes a matter of right.").

While the Defendant was incarcerated for the Hamilton County violation of probation, beginning October 13, 2006, he was not being "committed and held" in custody for the Rhea County charges underlying this appeal. In fact, he had been released on bond for the instant offenses when he was arrested for violating his Hamilton County probation. Because the Hamilton County offenses, and not the instant offenses, were keeping him in jail, we conclude that the trial court correctly awarded the Defendant jail credit for only the time he served before and after the service of his Hamilton County sentence. The Defendant is not entitled to relief on this issue.

## IV. Indictment

Finally, the Defendant argues that "the indictment simply recited the statute relative to the charges and did not contain facts and circumstances which would constitute the crime," and, therefore, the trial court erred when it failed to dismiss the indictment. The pertinent counts of the indictment provide as follows:

### COUNT II

The Grand Jurors of **Rhea** County, Tennessee, duly impaneled and sworn upon their oath, present that:

**MICHAEL W. POE** on the _____ day of August, 2006 in **Rhea** County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly kill one **Matthew Poe**, during the perpetration of **Aggravated Child Abuse**, in violation of **T.C.A. 39-13-302**, all of which is against the peace and dignity of the State of Tennessee.

### COUNT III

The Grand Jurors of **Rhea** County, Tennessee, duly impaneled and sworn upon their oath, present that:

**MICHAEL W. POE** on the _____ day of August, 2006 in Rhea County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly, and other than by accidental means, inflict serious bodily injury upon one **Matthew Poe**, a child under six (6) years of age, so as to adversely affect the health and welfare of said child, in violation of **T.C.A. 39-15-402**, all of which is against the peace and dignity of the State of Tennessee.

An indictment meets constitutional requirements if it provides sufficient information: (1) to enable the accused to know the accusation to which an answer is required; (2) to furnish the court an adequate basis for the entry of a proper judgment; and (3) to protect the accused from double jeopardy. State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). In addition, an "indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common

understanding to know what is intended." Tenn. Code Ann. § 40-13-202. Indictments patterned after the pertinent language of an applicable statute are ordinarily sufficient for constitutional and statutory purposes. See State v. Hammonds, 30 S.W.3d 294, 302 (Tenn. 2000).

As support for his argument that the indictment is deficient, the Defendant relies on State v. Clark, 2 S.W.3d 233 (Tenn. Crim. App. 1998). Count one of the indictment in Clark, stated as follows:

> [T]hat John Edward Clark on or about August 17, 1996, in Madison County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly attempt to commit the criminal offense of Aggravated Robbery, in violation of T.C.A. § 39-12-101 and T.C.A. § 39-13-402, all of which is against the peace and dignity of the State of Tennessee.

Id. at 234-35. This Court found that count one of the indictment was void because it "allege[d] a legal conclusion—that the defendant committed attempted aggravated robbery—without alleging the facts and circumstances which constitute that crime." Id. at 236. In State v. Hammonds, 30 S.W.3d 294, 303 n.8 (Tenn. 2000), when addressing a similar argument to the one the Defendant raises, our supreme court discussed Clark and stated as follows:

> Aggravated robbery is "robbery as defined in § 39-13-401: (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or (2) Where the victim suffers serious bodily injury." See Tenn. Code Ann. § 39-13-402(a). Under this statute, aggravated robbery has two elements: (1) robbery as defined in § 39-13-401 and (2)(a) use or display of a deadly weapon or use or (b) display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon or (c) serious bodily injury. The indictment in Clark did not allege the second element of the offense, deadly weapon or serious bodily injury.

In the instant case, we reject the Defendant's argument that the indictment was insufficient. First degree felony murder includes "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." Tenn. Code Ann. § 39-13-302(a)(2) (2006). Count two of the indictment named the Defendant, tracked the language of the felony murder statute, made specific reference to the statute, stated the underlying felony, provided the month and year of the offense, and identified the victim.

Aggravated child abuse is committed when a person "commits the offense of child abuse, as defined in § 39-15-401(a) . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1) (2006). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . ." Tenn. Code Ann. § 39-15-401(a) (2006). Count three of the indictment named the Defendant, tracked the language of the aggravated child abuse statute, made specific reference to the statute, provided the month and year of the offense, identified the victim, and stated the victim's age. Thus, we conclude that both counts of the indictment meet constitutional and statutory requirements and that the trial court did not err when it failed to dismiss the indictment. The Defendant is not entitled to relief on this issue.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE